**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSE G. HERNANDEZ, JR., <br><br> Plaintiff, <br><br> v. <br><br> ANDREW M. SAUL[1], <br> Commissioner of Social Security, <br><br> Defendant. | Case No.: 1:18-cv-0321 - JLT <br><br> ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(G) <br><br> ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF JOSE G. HERNANDEZ, JR. AND AGAINST DEFENDANT ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY |

Jose G. Hernandez, Jr., asserts he is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the medical record and seeks judicial review of the decision to deny his application for benefits. Because the ALJ failed to apply the proper legal standards, as discussed below, the administrative decision is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## **PROCEDURAL HISTORY**

On November 12, 2013, Plaintiff filed an application for benefits, alleging disability beginning October 3, 2007. (Doc. 9-6 at 22) The Social Security Administration denied the applications at both the initial level and upon reconsideration. (*See generally* Doc. 9-4) After requesting a hearing, Plaintiff

---

[1] This action was originally brought against Nancy A. Berryhill in her capacity as then-Acting Commissioner. Andrew M. Saul, the newly appointed Commissioner, has been automatically substituted. *See* Fed. R. Civ. P. 25(d).

1

testified before an ALJ on September 6, 2016. (Doc. 10-3 at 11, 31) The ALJ found Plaintiff was not disabled as defined by the Social Security Act, and issued an order denying benefits on December 27, 2016. (*Id.* at 11-23) Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied the request on January 8, 2018. (*Id.* at 2-5) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v.*

*Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

### A. Relevant Medical Evidence and Opinions[2]

Dr. Rustom Damania performed a consultative examination on March 21, 2013. (Doc. 9-9 at 10) Plaintiff told Dr. Damania in that in 2003 and 2008, he suffered injuries to his left knee, ankle, and patella, which required surgeries. (*Id.*) Dr. Damania observed that Plaintiff "walked with a slight limp on the left side," and Plaintiff reported "[h]e used a cane in the past but... he lost it." (*Id.* at 14) Dr. Damania determined Plaintiff had a normal range of motion in his back, neck, shoulders, elbows, and wrists. (*Id.* at 12-13) Plaintiff had tenderness in both knees and swelling in the left knee. (*Id.* at 13) Dr. Damania found Plaintiff had a normal range of motion in his right knee, but he was limited with flexion in the left knee. (*Id.*) According to Dr. Damania,

> [Plaintiff] should be able to lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant can stand and walk four to six hours out of an eight hour work day with normal breaks. The claimant can sit without restriction. No assistive device is necessary for ambulation. No postural limitations to bending and stooping but no frequent crouching or kneeling. Climbing and balancing would be an impairment.

(*Id.* at 14) Dr. Damania found no manipulative, visual, or communicative limitations. (*Id.*)

---

[2] The Court's analysis below focuses upon Plaintiff's physical residual functional capacity. Thus, while the Court has reviewed the entirety of the record, this summary of the medical evidence focuses upon the objective evidence and clinical findings related to Plaintiff's physical impairments.

3

In October 2013, Plaintiff's diabetes mellitus was "out of control" and he had a "diabetic right foot infection." (Doc. 9-10 at 65) On October 14, Plaintiff was admitted to Community Medical Center for treatment of the foot ulcer and infection, which included drainage. (*Id.* at 76, 81) He was treated with antibiotic and discharged on Keflex. (*Id.* at 76) The infection did not heal, and Plaintiff went to the emergency room to have the wound cleaned. (Doc. 9-12 at 36) Plaintiff was admitted to the hospital on October 23, and the following day Dr. Erin Mills performed an "[i]ncision and drainage, debridement, including amputation of the 3rd toe at the metatarsophalangeal joint." (Doc. 9-10 at 75; Doc. 9-12 at 36) On October 25, Plaintiff's fourth toe was amputated. (Doc. 9-10 at 78-79) On October 28, Dr. Randall Stern performed an open right forefoot amputation, after finding the prior procedures would not "reach ... [the] aspect of the open foot would where the original problem had existed." (*Id.* at 79, 80) Plaintiff was discharged on October 30, and he was ambulatory with a walker. (*Id.* at 81)

In December 2013, Dr. Elaina Tsui noted Plaintiff was "largely non-ambulatory" and using a wheelchair. (Doc. 9-10 at 84) She noted Plaintiff complained "of burning and shooting pain to [his] right foot," which was "worse at night." (*Id.*) She found the incision was "well healed" with no erythema or drainage. (*Id.*) Dr. Tsui opined Plaintiff's pain was likely neuropathic. (*Id.*) She increased the prescription for Gabapentin and ordered a "shoe filler and diabetic shoes." (*Id.* at 84-85) Dr. Tsui opined Plaintiff would be "OK to return to work" as of December 31, 2013. (*Id.* at 85)

Dr. Tomas Rios performed "a comprehensive internal medicine evaluation" on March 12, 2014. (Doc. 9-13 at 18) Plaintiff's chief complaint to Dr. Rios was his diabetes. (*Id.*) Plaintiff reported he had "residual sharp pain [in] both feet," which "affected his mobility" because he periodically lost his balance. (*Id.*) Dr. Rios noted Plaintiff "came to the examination office on a motorized wheelchair." (*Id.* at 19) Because Dr. Rios "could not isolate any specific weakness on [the] lower extremities or any significant loss of function of the weight-bearing joints," he indicated "[t]he necessity of the motorized wheelchair [was] highly doubtful." (*Id.*) Plaintiff had negative straight leg and Romberg tests, but demonstrated "difficulty with tandem gait." (*Id.* at 20) Dr. Rios found "[n]o evidence of muscle wasting" and opined Plaintiff's "overall motor strength [was] fairly preserved." (*Id.* at 21) He found no limitations with sitting or manipulative activities. (*Id.*) Dr. Rios concluded Plaintiff could stand and

walk "[u]p to six hours, requiring rest intervals every 15 minutes for five minutes." (*Id.*) Dr. Rios indicated Plaintiff "should use a cane only for long distances and uneven terrain." (*Id.*) In addition, he opined Plaintiff could lift and carry "20 pounds occasionally, 10 pounds frequently;" occasionally climb and balance; and frequently stoop, kneel, crouch, and crawl. (*Id.*) Dr. Rios concluded Plaintiff "should be prohibited from working at heights on account of his neuropathy." (*Id.* at 22)

Dr. Judith Forte reviewed the record and completed a physical residual functional capacity assessment on April 4, 2014. (Doc. 9-4 at 24-26) Dr. Forte noted Plaintiff was "near morbid obesity" and had diabetic neuropathy. (*Id.* at 26) She concluded that "considering all objective evidence in the file... and giving [the] claimant every benefit of the doubt," the record "could support" a restriction to sedentary work. (*Id.*) Dr. Forte concluded that between October 2013 and October 2014, Plaintiff was limited to lifting and carrying 10 pounds occasionally and "less than 10 pounds" frequently. (*Id.* at 24) She opined Plaintiff could stand and/or walk for a total of two hours and sit "[a]bout 6 hours in an 8-hour workday." (*Id.* at 24-25) Dr. Forte concluded Plaintiff did not have postural, manipulative, or environmental limitations. (*Id.* at 24)

Dr. D. Rose also reviewed the medical record and completed a residual functional capacity assessment on August 19, 2014, addressing the period of "10/14/2013- Present." (Doc. 9-4 at 38-40) Dr. Rose opined Plaintiff could lift and carry 10 pounds occasionally, "less than 10 pounds" frequently; stand and/or walk for a total of two hours each day and sit about six hours in an eight-hour day. (*Id.* at 38) In addition, Dr. Rose indicated that "for prolonged ambulation," Plaintiff should "use a cane as needed." (*Id.*) Dr. Rose determined Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; but he could never climb ladders, ropes, or scaffolds "due to [right] forefoot amputation and obesity." (*Id.* at 38-39) Further, Dr. Rose indicated Plaintiff should "[a]void even moderate exposure" to hazards such as unprotected heights and dangerous machinery, and "avoid walking on uneven terrain." (*Id.* at 39)

In October 2014, Plaintiff was treated for a right foot infection at Community Medical Centers. (Doc. 9-14 at 4, 44) On October 25, 2014, x-rays of his right foot showed marked soft tissue swelling, irregularity along the medial aspect, and possible osteomyelitis or post-operative changes. (*Id.* at 4) Plaintiff's wound was debrided and was evaluated "for deeper space infection." (*Id.* at 49)

On January 15, 2015, Plaintiff visited Clinica Sierra Vista and was "told to report immediately to the [emergency department] for further evaluation" of a foot ulcer. (Doc. 9-16 at 26) At the hospital, Plaintiff reported he had "been removing 'dead skin.'" (Doc. 9-14 at 50) Dr. Eli Lessard noted Plaintiff had "fever and chills," and his skin was diaphoretic. (*Id.* at 50-51) The same day, Dr. Erinn Kim performed a vascular surgery consultation and indicated Plaintiff would receive "a trial of non-operative therapy but [he] may ultimately need a below knee amputation ... if he does not resolve." (*Id.* at 56) On January 20, Plaintiff proceeded with a "[r]ight guillotine below-knee amputation" because the ulcer had "a copious amount of purulent drainage." (*Id.* at 66-67) A revision of the amputation and "formal closure" was performed on January 23. (*Id.* at 68-69) Plaintiff was discharged from the hospital on January 27, 2015. (*Id.* at 70)

Two weeks following the amputation, Plaintiff had "small serosanguineous ooze from [the] right central aspect of [the] incision." (Doc. 9-14 at 78) Jeffrey Russell, PA, directed Plaintiff to "elevate [his] leg" for an additional week, to decrease edema. (*Id.*) Mr. Russell opined Plaintiff's incision was healing well on March 10, 2015; and he referred Plaintiff to prosthetics. (*Id.* at 79)

On April 2, 2015, Plaintiff went to the emergency room for "stump pain" after "falling and landing on point of stump." (Doc. 9-14 at 79) Dr. Michael Darracq found "no free air or evidence of bony infection," and imagining was normal. (*Id.* at 81) Dr. Darracq prescribed a "course of oral analgesics" and "chlorhexidine wash to help reduce MRSA colonization." (*Id.*) He also encouraged Plaintiff to follow-up with his primary care physician or establish care with a new physician. (*Id.*)

On April 23, 2015, Plaintiff visited Clinica Sierra Vista for a medication follow-up. (Doc. 9-16 at 2) Plaintiff was using a wheelchair for mobility and reported he had been contacted by a prosthetic company but was "having some trouble with the prescription for prosthesis." (*Id.*)

In May 2015, Plaintiff was evaluated by Erin Dueker, a physical therapist, "for strength and mobility to determine [the] appropriateness of [an] Electric Wheelchair." (Doc. 9-17 at 8) Ms. Dueker noted Plaintiff was using manual wheelchair and stated his equipment at home included a shower chair and bedside commode. (*Id.*) Plaintiff stated he spent 10 to 12 hours per day in his chair, and he could "stand 2-3min while holding onto [a] counter or wall to perform" activities of daily living. (*Id.* at 8-9) Ms. Dueker determined Plaintiff had "good arm strength for learning to ambulate with a prosthesis,"

also noted "he does not have one at this time." (*Id.* at 9) She concluded an electronic wheelchair was "not appropriate" and recommended Plaintiff "pursu[e] a prosthesis" and work on standing and walking with that device. (*Id.*) On June 30, 2015, Plaintiff was fitted for the prosthetic leg. (Doc. 9-18 at 56)

In September 2015, Dr. Robert Jablonski observed that Plaintiff continued to use a wheelchair and did "not appear motivated to use [the] artificial leg." (Doc. 9-18 at 48) Dr. Jablonski noted Plaintiff gave him "papers for disability." (*Id.*) Dr. Jablonski referred Plaintiff to physical therapy for evaluation and treatment. (*Id.*)

In December 2015, due to reports of chronic back pain, Plaintiff had an MRI of his lumbar spine, without contrast. (Doc. 9-18 at 33-34) The imaging showed that at the L4-5 level, Plaintiff had a "central to right paracentral disc protrusion measuring 5mm" and "[t]he spinal canal [was] moderate to severely narrowed." (*Id.* at 33) At the L5-S1 level, Plaintiff had "a 2-3mm broad-based disc protrusion" and the spinal canal as "moderately narrowed." (*Id.*)

Dr. Jablonski referred Plaintiff to a neurosurgeon in February 2016. (Doc. 9-18 at 22, 27) In addition, Dr. Jablonski prescribed a cane for Plaintiff and indicated a new prosthetic was being ordered. (*Id.* at 28)

In May 2016, Plaintiff "fell to the floor and injured his right stump," fracturing the bone, when his prothesis fell off. (Doc. 9-17 at 14; Doc. 9-19 at 6) He began using his older prosthetic due to discomfort with the new one, while waiting for a refitting. (Doc. 9-19 at 6)

**B.    The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff had not engaged in substantial gainful activity after the amended onset date and application date of November 12, 2013. (Doc. 9-3 at 13) At step two, the ALJ found Plaintiff "has the following severe impairments: status-post right guillotine below-knee amputation in January 2015; history of methicillin resistant staph aureus (MRSA) in October 2013 and status-post transmetatarsal amputation of right foot in October 2013; diabetes mellitus type II with peripheral neuropathy; obesity; and lower back pain." (*Id.*) At step three, the ALJ opined these impairments did not meet or medically equal a listed impairment. (*Id.* at 16) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a), including lifting and carrying 20 pounds occasionally

7

and 10 pounds frequently in an eight-hour workday. He can sit for six hours. He can stand for six hours with the option to sit for up to 30 minutes after standing or walking for five minutes. He can walk for six hours with the option to sit for up to 30 minutes after standing or walking for five minutes. He can never use right foot controls. He can occasionally reach overhead with both arms. He can never balance, kneel, crouch, crawl, and climb ladders, ropes, or scaffolds. He can occasionally climb ramps or stairs. He must avoid hazards such as unprotected heights and dangerous moving machinery.

(*Id.* at 33) With this residual functional capacity, the ALJ determined Plaintiff was "unable to perform any past relevant work." (*Id.* at 22) At step five, the ALJ found Plaintiff could perform "jobs that exist in significant numbers in the national economy." (*Id.*) Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 23)

## **DISCUSSION AND ANALYSIS**

Plaintiff contends the ALJ erred in determining his residual functional capacity ("RFC"), asserting the ALJ's findings are unsupported because all medical opinions in the action were offered prior to his below-the-knee amputation. (Doc. 15 at 7-8; *see also id.* at 8-11) In addition, Plaintiff asserts the ALJ erred in reviewing the medical evidence because he gave "significant weight" to the opinions of the examining physicians that predated the amputation, and yet had assessed greater limitations than those identified by the ALJ. (*Id.* at 9)

**A.     The Residual Functional Capacity**

A claimant's residual functional capacity is "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(c) (defining an RFC as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs"). In formulating a RFC, the ALJ weighs medical and other source opinions, as well as the claimant's credibility. *See, e.g., Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226 (9th Cir. 2009). Further, the ALJ must consider "all of [a claimant's] medically determinable impairments"—whether severe or not—when assessing a RFC. 20 C.F.R. §§ 405.1545(a)(2), 416.945(a)(2).

The ALJ explained that he gave "little weight" to the opinion of Dr. Damania from March 2013 "because the claimant subsequently underwent a below knee [amputation] of the right leg, which warranted a reduction in the residual functional capacity..." (Doc. 9-3 at 21) The ALJ indicated he

gave "significant weight" to the opinions offered in April 2014 and August 2014 by Drs. Forte and Rose, who each opined Plaintiff "could lift and carry 10 pounds occasionally and less than ten pounds frequently, stand or walk for two hours, and sit for six hours in an eight-hour day." (*Id.*) Finally, the ALJ gave "greater weight" to the opinion of Dr. Rios that "Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently ... because it was more consistent with the examination findings and medical record." (*Id.*)

Plaintiff asserts the ALJ erred in evaluating the RFC with the medical opinions in this manner, because each of the opinions predated the below-knee amputation and "[t]he record is devoid of any opinion evidence regarding [Plaintiff's] functioning capabilities in light of Hernandez's deteriorating medical condition that eventually necessitated below-knee amputation." (Doc. 15 at 9) In addition, Plaintiff notes the medical record also includes MRI results documenting disc protrusion and "moderate to severe[] narrowing of the spinal canal," which the physicians "did not have an opportunity to consider" when evaluating Plaintiff's residual functional capacity. (*Id.* at 10)

The Commissioner argues that Plaintiff's argument fails because "the ALJ's interpretation of the evidence as not indicating disability was reasonable and supported by substantial evidence." (Doc. 18 at 19) According to the Commissioner, "The ALJ properly considered all the medical opinion evidence and resolved differences in opinion to find that Plaintiff was limited to sedentary work with the capability to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for six hours, and sit for six hours, and no balancing, no being around unprotected heights and dangerous machinery, as well as other limitations." (*Id.* at 20) The Commissioner maintains Plaintiff failed to identify "any evidence that he was further restricted than found by the ALJ, before or after his below knee amputation." (*Id.* at 19)

Notably, Plaintiff's below-the-knee amputation occurred after each of the physicians offered opinions on Plaintiff's limitations. Indeed, the ALJ rejected the opinion of Dr. Damania for this very reason, but purportedly accepted the other opinions in some manner. (*See* Doc. 9-3 at 21-22) In addition, none of the physicians who offered opinions regarding the residual functional capacity reviewed the results of the MRI in December 2015, which showed a "central to right paracentral disc protrusion measuring 5mm" and "[t]he spinal canal [was] moderate to severely narrowed" at the L4-5

level; and "a 2-3mm broad-based disc protrusion" with "moderately narrowed" spinal canal at the L5-S1 level. (Doc. 9-18 at 33-34) Evidently, the ALJ reviewed these findings and concluded Plaintiff could perform work at the sedentary exertion level, with several additional limitations.[3]

Because no physician reviewed the MRI results or the clinical findings from the examinations after June 2013, the ALJ clearly rendered his own medical findings that Plaintiff could perform light work with the additional limitations, such as standing "for six hours with the option to sit for up to 30 minutes after standing or walking for five minutes." (*See* Doc. 9-3 at 16) However, it is well-settled law that an ALJ may not render his own medical opinion and is not empowered to independently assess clinical findings. *See, e.g., Tackett v. Apfel*, 180 F.3d 1094, 1102-03 (9th Cir. 1999) (holding an ALJ erred in rejecting physicians' opinions and rendering his own medical opinion); *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion, and he must not succumb to the temptation to play doctor and make his own independent medical findings"); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (as a lay person, the ALJ is "simply not qualified to interpret raw medical data in functional terms"). "When an ALJ rejects all medical opinions in favor of his own, a finding that the RFC is supported by substantial evidence is less likely." *See Stairs v. Astrue*, 2011 WL 318330, at *12 (E.D. Cal. Feb.1, 2011). For example, this Court determined an ALJ erred where all medical opinions were rejected before the ALJ formulated the RFC. *See Perez v. Comm'r of Soc. Sec.*, 2018 WL 721399 (E.D. Cal. Feb. 6, 2018).

In *Perez*, a physician concluded after a consultative examination that the claimant "had no functional restrictions", and two non-examining physicians opined the claimant "had no severe physical impairments. *Id.*, 2018 WL 721399 at *6. The ALJ "gave no weight" to these opinions, finding the record indicated the claimant had some limitations. *Id.* "After rejecting all the doctor's opinions, the ALJ concluded that Plaintiff would be capable of a reduced range of light work with postural manipulative and environmental restrictions." *Id.* The Court found the ALJ erred, explaining:

> A claimant's residual functional capacity is not a medical opinion, but is an issue to be decided by the ALJ. 20 C.F.R. §§ 404.1527(d)(2), 416.920(d)(2). However, the

---

[3] Notably, although the ALJ indicated Plaintiff was limited to "sedentary work as defined in 20 CFR 416.967(a)" (Doc. 9-3 at 16), the lifting and carrying requirements identified by the ALJ of 20 pounds occasionally and 10 pounds frequently are consistent with light work, which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." *See* 20 CFR 416.957(b).

| | |
|---|---|
| 1 | finding must be supported by substantial evidence in the record and the ALJ must explain his reasoning behind the RFC. 42 U.S.C. § 405(b); 20 C.F.R. §§ 404.1520c, 416.920c. |
| 2 | |
| 3 | Here, the ALJ stated that the RFC was supported by the weight of the objective evidence and Plaintiff's less than credible testimony. But the Court is unable to determine how the ALJ arrived at the conclusion that Plaintiff was capable of light work. Absent adequate explanation of the record, without specific support from a medical source, and with no testimony from a medical expert, the ALJ appears to have defined his own limitations for Plaintiff. The Court finds that this was error. *See Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (the ALJ was not qualified as a medical expert and therefore could not permissibly go outside the record to consult medical textbooks for purpose of making his own assessment of the claimant's physical condition); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person,... the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). |

*Id.,* 2018 WL 721399 at *7-8. Without the support of a physician's opinion, the Court concluded the RFC lacked the support of substantial evidence. *Id.* at *8.

As noted above, here, the ALJ alone reviewed the treatment records following Plaintiff's below-the-knee amputation and MRI findings and concluded Plaintiff could perform work at the sedentary exertion level, rejecting the opinions offered by Drs. Rios, Forte and Rose prior to the amputation. For example, Drs. Rios and Rose indicated the use of a cane was appropriate for long distances, and Dr. Rose concluded Plaintiff should "avoid walking on uneven terrain." (*See* Doc. 9-4 at 38-39) In addition, a cane was later prescribed, following the additional amputation, for Plaintiff by his treating physician. (Doc. 9-18 at 28) The Court is unable to determine why the ALJ believed Plaintiff could stand or walk "for six hours with the option to sit for up to 30 minutes after standing or walking for five minutes" and could occasionally reach overhead with both arms—particularly if a cane was needed.

As in *Perez*, there simply is no evidence to support the findings of the ALJ, who was the only individual to review the record and objective findings after Plaintiff's below-the-knee amputation. Without physicians' opinions to support the ALJ's conclusions, the Court is unable to find substantial evidence supports the RFC determination. *See Perez,* 2018 WL 721399 at *7-8; *Perez v. Sec'y of Health & Human Servs.*, 958 F.2d 445, 446 (1st Cir. 1991) (holding "the ALJ's conclusions are not supported by substantial evidence" if an RFC is formulated without the findings of a physician).

///

**B.     Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v*, 80 F.3d at 1292. In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Here, the RFC articulated by the ALJ lacks the support of substantial evidence in the record, and the matter should be remanded for further consideration. *See Tackett*, 180 F.3d at 1102-03 (remanding the matter to the Social Security Administration for reconsideration after finding the ALJ erred by offering his own medical conclusion, which was not supported by any medical evidence); *Perez*, 958 F.2d at 446 (finding that where the ALJ offered an opinion the support of an "assessment of residual functional capacity by a physician, …it is necessary to remand for the taking of further functional evidence").

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ erred in his evaluation of Plaintiff's RFC and failed to apply the correct legal standards. Consequently, the ALJ's decision cannot be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Because the Court finds remand is appropriate regarding Plaintiff's physical RFC, it offers no findings on the remaining issues raised by Plaintiff in his opening brief.

Accordingly, the Court **ORDERS**:

1.     The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further

proceedings consistent with this decision; and

2. The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff Jose G. Hernandez, Jr. and against Defendant, Andrew M. Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **August 1, 2019**     **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE